UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
WILLIAM BERROYER, SR. and RUTH BERROYER,

                Plaintiffs,

And

TECHNOLOGY INSURANCE CO., as subrogee of
BEST-TEMP MECHANICAL CORP.,

                Intervenor Plaintiff,

        - against -

UNITED STATES OF AMERICA,

                Defendant(s).
------------------------------------------------------------------------x

**FILED**
**CLERK**

1/2/2014 11:50 am

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**MEMORANDUM OF**
**DECISION AND ORDER**
10-CV-3888 (ADS)(ARL)

**A P P E A R A N C E S:**

    **SULLIVAN PAPAIN BLOCK MCGRATH & CANNAVO, P.C.**
        Attorneys for the Plaintiffs
        55 Mineola Boulevard
        Mineola, New York  11501
    BY:   Robert G. Sullivan, Esq., of Counsel


    **LORETTA E. LYNCH**
        United States Attorney
        Eastern District of New York
        610 Federal Plaza
        Central Islip, NY 11722
    By:   James H. Knapp,
        Assistant U.S. Attorney


    **KLG LUZ & GREENBERG LLP**
        Attorneys for the Proposed Intervenor Technology Insurance Co.
        370 Lexington Avenue, 24th Floor
        New York, New York  10017
    BY:   Luke Tynan, Esq., of Counsel

1

**SPATT, District Judge.**

This is an action brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), to recover damages for personal injuries sustained by the plaintiff William Berroyer, Sr. (the "plaintiff" or "Berroyer") in a conference room in an Internal Revenue Service ("IRS") facility on July 23, 2008. There is also a claim for loss of services by his wife Ruth Berroyer.

This decision is rendered following a four day non-jury trial.

On August 24, 2010, Berroyer and Ruth Berroyer ("Mrs. Berroyer") (collectively, the "plaintiffs") commenced this action against the United States of America (the "defendant"), asserting claims pursuant to the Federal Tort Claims Act for money damages arising out of an incident that took place at an Internal Revenue Service ("IRS") building. The plaintiffs claim that while Berroyer was meeting with an IRS auditor, his foot became caught in a long telephone utility cord which was under the table, which caused him to fall into a filing cabinet and consequently suffer serious injuries.

## I. THE TRIAL - FINDINGS OF FACT

### A. The Plaintiffs' Case

#### 1. Robert L. Brunet

Robert L. Brunet is a code enforcement officer in the Town of Poestenkill in Rensselaer County, New York. In his position, he has reviewed buildings for safety conditions. He has more than fifty years of safety involvement. Brunet has also reviewed buildings for safety with respect to the placement of cables and wires, and the

placement of telephones and telephone cables, hundreds of times.  Also, he has reviewed offices with respect to the placement of telephones and the running of telephone cords either along the floor or under the floor, hundreds of times.

In this case, he was provided with all of the depositions, the interrogatory responses and all the photographs.  Brunet also visited the site of this occurrence and took measurements.

Brunet was asked a hypothetical question.  He was asked to assume that the plaintiff William Berroyer, Sr., was led into the conference room and directed where to be seated.  He met with an IRS employee for approximately forty-five minutes seated across the table from the IRS employee.  There was a fifteen foot telephone cord under the table that Berroyer did not see or feel.  Brunet was asked to assume that Berroyer got up, started to leave the meeting and when he did so, the telephone wire was wrapped around his foot and he fell.  Brunet was then asked the following questions:

> Do you have an opinion, with a reasonable degree of certainty in your field of not only engineering but concentration on safety with respect to placement of phone wires, et cetera, as to the cause of his fall?
>
> Just yes or no, do you have such an opinion?

A.    Yes.

Q.    What is your opinion?

A.    The 15-foot cord unsecured was the cause of the accident.

*    *    *    *    *

Q.    Do you have an opinion as to whether or not the 15-foot cord under the table is a recognized safety issue in the field of office safety?

Just yes or no, do you have such an opinion?

A. Yes, I do.

Q. What is your opinion?

MR. KNAPP: Objection. Asked and answered.

THE COURT: Overruled.

A. My opinion is that the unsecured 15-foot cord is absolutely unsafe, and that is supported by various documents from OSHA, from the government-signed contracts and from other documents available.

(Tr. at 18, 19).

Brunet was also asked about the testimony of Richard Enterlin, the IRS agent representative who was present at the meeting with the plaintiff. Enterlin testified at his deposition that: "Between the box on the floor and the phone on the table, there was 15 feet of loose cord not taped or secured, under the table." Based on this description Brunet testified that there was a "trip hazard." Brunet was then asked for two other opinions:

Q. I also want to ask you to assume that Richard Enterlin, the IRS agent representative at the meeting, testified on page 53 of his deposition: Between the box on the floor and the phone on the table, there was 15 feet of loose cord not taped to or secured under the table.

Do you agree based on his description it's a trip hazard?

A. Absolutely, yes.

Q. Do you have an opinion, with a reasonable degree of certainty in your field, as to whether or not this trip hazard you described is foreseeable in your field based on your training and expertise that it can cause someone to trip and fall?

Do you have such an opinion?

A. Yes.

Q. What's your opinion?

4

A.      Yes.

(Tr. at 23, 24).

Brunet also testified that, in his opinion the telephone cord should have been attached to the legs of the table with proper fasteners, among other protections.

On cross-examination, Brunet testified that if an individual went into a conference room, sat down at a table and saw a telephone on the table with a cord extending across the table in the direction of where the person was sitting and then going under the table, it would be fair to assume that the cord continues under the table.

Also it was brought out that the IRS was in the building at issue since the mid 1990s and that probably, "hundreds if not thousands of taxpayers entered that conference room, sat in the same chair and left without incident."

### 2.  **Deposition of John Stellacio**

A portion of the deposition of John Stellacio, a thirty-eight year employee with the IRS was read into the record.  He testified that the telephone and the telephone cord were purchased by the Government and placed in the building.  It was a new building and the IRS had this infrastructure in it.

### 3.  **Deposition of Richard Enterlin**

Portions of the deposition of Richard Enterlin were read into the record in the plaintiffs' case.  He prepared the Government accident report in this case.  Enterlin was employed by the IRS since September 1974.  The incident at issue took place at the IRS facility located at 1180 Veterans Memorial Highway in Hauppauge in a room

5

designated by the IRS as Room 323. This room was called a conference room and was used to interview taxpayers; to hold meetings; and occasionally as a lunch room. Enterlin was in Room 323 fifteen to twenty times a week. There was a metal file cabinet in the room. The metal file cabinet was close to the wall; was almost six feet high; and a foot and a half deep. There was a cord approximately fifteen feet in length between the telephone box and the telephone. According to Enterlin, the cord may have been taped in spots. This observation was not made on the date of the occurrence. In this regard, Enterlin responded as follows:

Q.      When you observed it, was there anything that attached the phone cord to any part of the floor from the jack to the leg of the table?

A.      No.

*     *     *     *     *

Q.      On the day of the meeting, at any time on July 23, 2008 prior to the meeting, you are not sure whether or not you physically looked at the cord under the table?

A.      Right, I would have no reason to look at the cord on the floor. I was interviewing a taxpayer.

(Tr. at 53).

Asked who was responsible for putting tape on the cord, Enterlin stated that he did not recall anyone having that responsibility. Further, even after tape was being used to fasten the telephone cord, on occasions he observed the cord not taped to the table. On those occasions, he would not say anything to anyone to retape the telephone line.

On the day of this occurrence, the meeting with the plaintiff lasted more than a half hour and less than an hour. Enterlin directed the plaintiff where to sit. The plaintiff

6

sat in a chair near the filing cabinet. During their meeting, the telephone was not used. Enterlin never said anything to the plaintiff about the telephone cord on the floor. During their meeting the telephone was never moved. Enterlin described his meeting with the plaintiff as a "pleasant meeting." There were no altercations. He testified that, when the meeting ended, the plaintiff stood up and, "He lost his balance. Fell to his right and hit his shoulder into the metal cabinet." (Tr. at 58). The plaintiff's right shoulder hit the metal cabinet with moderate impact. At that time, the telephone on the table also moved toward the plaintiff and the metal cabinet, and the telephone receiver came loose. Also, he saw the cord move along with the receiver of the telephone which became loose.

Following this occurrence, Enterlin filed a report, (Dft's Ex. R), which reads as follows:

> "Taxpayer tripped when his foot caught on a telephone wire under the table. The taxpayer lost his balance, fell into a metal file cabinet. The individual was able to walk out of the building. He called from the parking lot to say he lost feeling in his lower leg and that his shoulder hurt. He called from his cell phone. He stated at the beginning of the interview that he had hearing trouble and appeared to have sight issues."

(Tr. at 64-65).

### 4. Plaintiff William Berroyer, Sr.

The plaintiff was born on May 27, 1947 and is currently sixty-six years of age. He was sixty-one years of age at the time of this occurrence. He is married, has two children and lives in Nesconset in Suffolk County. The plaintiff was born with a hearing problem and wears a hearing aid. He also wears glasses for reading. His education

consisted of several years of college in Farmingdale.  The plaintiff was a sheet metal worker for ten years.  He then started his own business with his brothers in 1977.  His business is called Best-Temp Mechanical Corp. and is a heating and air conditioning company for industry and homes.  In the year 2007, the company had thirty to seventy employees and forty trucks.

In the years 2006 and 2007, Berroyer filed joint income tax returns with his wife, who was a bookkeeper in his company.  His earnings during that period were $104,000 per year.  His company had IRS issues previously.  On this occasion, his brother was on vacation and he went to the IRS meeting on July 23, 2008 at 10:00 am.

The plaintiff testified that at the time of his meeting at IRS on July 23, 2008, he had no medical issues.  He had no back pain or leg pain.  He went to a chiropractor in the past during the course of his working as a sheet metal worker, when he had back pain.  He received three epidural injections eight to ten years prior to this occurrence.  At the time of this occurrence, and for twenty-five years before that, his primary doctor was Dr. John Franco.

With regard to the IRS, Berroyer testified that he owed approximately $60,000 in taxes.  He agreed with this figure and there was no animosity at the IRS meeting.  He and Enterlin worked out a payment schedule.  The IRS meeting took place in Room 323.  When he arrived Enterlin directed where he should sit at the conference table.  There was a telephone on the table, chairs around the table, some spare furniture and a metal cabinet in the room.  He did not take any "particular" notice of the telephone on the table.  Berroyer testified that he was very nervous at the meeting.  The meeting lasted forty-five minutes.  During that time, Enterlin did not say anything about the

telephone cord under the table and the plaintiff never saw the telephone cord under the table before he fell.

When the meeting was over, he got up, shook hands with Enterlin and exchanged thanks. When the plaintiff started to leave, his right foot would not move and he was caused to spin around and he fell and hit the metal cabinet. As he testified:

> As I spun around, I spun around all the way so I believe at the time that I actually went around more than a full - - like I was facing the table, I spun around more than 45 degrees, more than a quarter of a circle.
>
> So now I was facing Mr. Enterlin. I spun towards the wall but even more so to figure out what I could grab to break my fall on the way down and the metal cabinet happened to be there.
>
> I really can't say for sure whether I hit it with my shoulder, hand or elbow, but I broke my fall on the cabinet and the cabinet was quite away and my feet weren't moving, so I was pretty much stretched out at that point and I was down pretty far before I was able to contact the file cabinet.

(Tr. at 113, 114).

Berroyer saw that the telephone cord was wrapped around his boot. He was wearing ankle high construction boots. At the end of his fall he was on his knee and he saw the cord wrapped around his boot. The plaintiff never saw or felt the cord before he fell. After he fell, the plaintiff described the scene as both him and Enterlin being "shocked." Enterlin kept saying, "are you okay;" "do you need a chair." The telephone on the table was smashed on the floor. Berroyer never saw or felt the cord before he fell. He never knew of the existence of the cord before he fell. Questioned about how he felt after the fall, Berroyer testified that he was confused about whether he was hurt or wasn't hurt. He just wanted to "get out of there" and go down and sit in his truck and

reflect on what occurred, and take inventory of his body. In his truck, the plaintiff felt pain in both knees; like a pressure pain. Also, his legs and the very lower part of his feet felt odd. However, Berroyer felt that these conditions "could be shaken off" and that he didn't need to be rushed to the emergency room and he left. He headed back to his shop, which was ten minutes away.

Back at his shop, Berroyer was rattled and not thinking straight. He explained what happened to his wife and other employees in the office. His legs were warm; progression had taken place in his legs. He decided to go home and lay down. He went out to his car, but he couldn't work the brake or the gas pedal. He couldn't put enough pressure on them to make them work. From the car he called his wife in the office. She had two men come out and they assisted him by putting his hands around their shoulders and carried him in that fashion to his wife's car. His wife drove him to Dr. Franco's office. He wanted to call an ambulance but they told him that she should drive him to St. Catherine's Hospital.

At St. Catherine's Hospital he was admitted and given a spinal tap and an MRI and placed in the intensive care unit. Berroyer was a patient in St. Catherine's Hospital for seven days. He received a steroid injection and was in shock and was high for two days, maybe longer. While he was in the hospital he was frightened. Apparently, no one knew what was wrong with him. He was then transferred to the St. Charles Hospital Rehabilitation Center, where he stayed for ten days. Berroyer described the condition of his legs:

> Q.     While you were in the rehab place physically, not emotionally, physically, how did you feel?

A.    My legs were pretty much totally paralyzed.  I couldn't move them for all intents and purposes.  I couldn't move them.  They had me on the bed and they had my legs, my feet blocked up so that my toes wouldn't be straight and they wouldn't stay straight, some kind of condition, they look at it when you lay in bed.

My legs were swollen, blue and cold, and they were trying to figure out what feelings I had in my legs, and they had determined there was little inconsistencies and oddities.  I was still in shock throughout that whole thing.

Again, I was still frightened to death.  I had gone from - -

(Pause in proceedings).

I had gone from everything to nothing and I was frightened.

(Tr. at 121).

Berroyer saw a psychiatrist while he was at St. Catherine's Hospital.  The Court notes that during this testimony, the plaintiff visibly started to cry.

Some time after his discharge from St. Catherine's Hospital, a neurologist who was treating him sent him to Stony Brook Hospital for an SSEP test.  Thereafter, the plaintiff went to the Columbia-Presbyterian Hospital, under the care of Dr. Michael Rubin, a neurologist.  The plaintiff was subsequently examined by two doctors on his behalf and two doctors retained by the defendant.

As of July 2009, one year after this occurrence, Berroyer described his average day.  As far as his upper body, he had been going to therapy continuously and he felt stronger and had "a lot more" upper body strength and more mobility.  His legs gave him a great deal of pain, as they do now.  He doesn't sleep well at night because his legs are painful.  A year after he was injured he couldn't do much.  He had braces on both legs that made his legs rigid from his hips down.  He used Canadian crutches to

walk.  At that time, he was going to Stony Brook Hospital five days a week for physical therapy.  Berroyer had to stop using the Canadian crutches because he herniated his chest by putting a great deal of stress on his shoulders.  He then used two canes and then one cane with a long transition period, and only for short periods of time because his wrists and elbows were affected.  Most of the time he uses a wheelchair to ambulate.  He appeared in Court in a wheelchair.

Prior to this accident, the plaintiff described his life and the person he was.  The plaintiff was a close family person with his wife, children and grandchildren.  He was into boating and had his own boat.  He was very sociable and traveled with five different boats for three weeks at a time for thirty years before this occurrence.  The plaintiff loved golf, photography and dancing.  Again, at this point in his testimony, the Court noted that the plaintiff was crying on the witness stand.  The plaintiff led a very busy life including trips to Florida during the winter.  Also, around the house, the plaintiff loved working with his hands.  He installed three different air conditioning systems; replaced his kitchen; and did the bathroom over, among other renovations in his home.  Also, he walked with his wife, some five to ten miles a day; and they shopped together.

Now, he can drive a car using his hands only and brings the garbage cans out to the street in good weather.  Also, he can go into the large stores with wide aisles while in his wheelchair.

Sexually, prior to this occurrence he was very active, two to three times a week.  After this occurrence, he and his wife have sexual activity once a month.  His legs are in pain, he is exhausted and it has interfered with his sexual life.

Berroyer owns a forty foot boat, which he had prior to this incident.  He still goes

on boat trips with friends. In fact, just prior to the trial he and his wife went on an five

boat eighteen day boat trip. While on the boat he does not use his cart. He uses

crutches or crawls. Prior to this occurrence, he used to maintain his boat himself, even

to the point of diving under the boat to untangle lines. He no longer can maintain his

boat himself.

As to his company, Best-Temp Mechanics, his brother now runs the business.

He is not able to get out in the field. Berroyer stopped working for the company on the

day of the accident. His last day at work was the day he was injured in this occurrence.

Best-Temp paid his home equity loan for six months. At the time of this occurrence he

had no "personal financial difficulties." (Tr. at 141). After this occurrence, Berroyer

received Workers' Compensation payments of $2,100 per month. In addition, he

received Social Security Disability payments of $2,200 per month. He is aware that if

he prevails in this case, he must repay two-thirds of the Workers' Compensation lien.

In addition, Berroyer had disability insurance that guaranteed to pay the difference up to

$55,000 per year in total including the Workers' Compensation and Social Security

Disability payments. The disability insurance payments were approximately $900 per

month.

Also, Workers' Compensation paid and continues to pay his medical bills.

As to his present complaints five years after the accident, Berroyer testified that

he still has leg pain and "a lot" of hand and arm pain. He wakes up at night with his

arms being numb and his legs in pain. Around the house, he is able to do more

cooking now; his upper body strength has improved; and he can lift himself out of the

chair and get things done in his home. He is able to fix and repair things in his house.

However, he can't do some of the things he used to easily do.

Berroyer has never seen a psychiatrist or a psychologist for treatment nor has he underwent counseling. During the week when his wife is at work he reads; he is on the computer; he plans the meals; he drives his grandchildren around; and he picks up his grandson from the bus. Directly questioned by his counsel about the defendant's doctors, Dr. Rosen and Dr. Hershberger saying that he is "faking," he denied this and stated affirmatively that he was not "faking" and feels "blind-sided" by the doctors.

With regard to a video showing him getting out of his car using one cane, Berroyer contends that the video is "speeded up" and makes him look faster than he was going, twice the speed he normally travels. However, he testified that he is able to drive his car and he is able to get into the car with one cane and get out of the car using one cane and walking the twelve feet to the door. Also, he is able to walk up to about twenty feet using one cane. With regard to walking as far as fifty feet, he can do that with two canes. Using two crutches or two canes Berroyer can "maybe" walk fifty to seventy-five feet. He never measured it.

On cross-examination, Berroyer testified that he owned and operated the heating and air conditioning business with his brother for thirty years. During that period his wife was the bookkeeper for the business. He stated that his yearly income for the years 2006 and 2007 was $104,400. He was on a basic salary. However, in evidence is a W2 form in his name for the first six months of the year 2008 showing that his wages were the sum of $22,049.12.

As to this occurrence, on July 23, 2008 the plaintiff went to the IRS office to discuss back taxes with Enterlin. In the conference room he passed a metal file cabinet

14

and sat down at the table in the first chair he came to.  He was directly across from Enterlin.  He did not see a telephone on the table and he did not see a telephone cord under the table.  He doesn't recall anything being on the table.  The meeting lasted approximately forty-five minutes.  There were no breaks in the meeting and he never stood up.  Berroyer was pleased with the outcome of the meeting and he would start making payments.  Some issues were not resolved.  Enterlin gave him records to take home and fill out.  According to the plaintiff the company owed approximately $60,000 in social security taxes for which both the company and the principals of the company, personally, were liable for.

As to the conclusion of the meeting, the plaintiff stood up and shook hands with Enterlin, when he tripped and fell into the metal filing cabinet with his right hand and right shoulder.  Although he was somewhat unsure, because this was five years after the occurrence, somehow, he landed on his knees on the floor and he could see the cord over his boot.  Berroyer knows that he tripped on the telephone cord when he saw the cord wrapped around his boot.  He first saw the cord after he fell.  Berroyer sat on the floor for four or five minutes.

After the occurrence, the plaintiff met with a Dr. Shields, a neurologist, who took a history from him.  Dr. Shields issued a report dated April 9, 2012, some four years after the accident.  The report indicates that the plaintiff said he caught his leg on a tangled office telephone cord and crashed into a filing cabinet, but he was not sure what part of his body immediately struck the filing cabinet.

As to the medical portion of the plaintiff's cross-examination, he testified that a short time after the accident his wife drove him to St. Catherine of Sienna Hospital.  At

15

that time, the plaintiff felt a burning sensation in his legs. The St. Catherine's Hospital record reflected that his "MRI findings are relatively minor." He refused to have a lumbar puncture performed and he was able to stand and walk to the commode "steadily." On July 26, 2008, he was diagnosed with "acute paraplegia, psychogenic in origin." On that same day, July 26, 2008, the record revealed, "psychogenic paraplegia cannot be ruled out," and "patient able to maintain stand one minute."

On July 31, 2008, the plaintiff's last day at St. Catherine's Hospital, he had a psychological consultation; and the record revealed:

> "Neuro exam and MRI findings not compatible with subjective complaints, raising question of conversion disorder. Affect is somewhat inappropriately bright."

(Tr. at 202).

While the plaintiff was as St. Catherine's Hospital he consulted with an attorney from the Sullivan law firm. On July 31, 2008, the plaintiff transferred from St. Catherine's Hospital to St. Charles Hospital. The St. Charles record reveals that the "patient can stand, pivot, post over into bed from WC" (wheel chair). There is a history of chronic recurrent low back and leg pain in the past. He had epidural injections with improvement. He also had a history of neck pain in the past with previous soreness in some part of the back. At St. Charles Hospital there was a progress note as of August 7, 2008, stating "inconsistent muscle strength, psychogenic?" Also on August 8, 2008, the record revealed that the plaintiff's attitude was very carefree and not concerned if he was in a wheelchair for two years. The plaintiff was discharged from St. Charles Hospital on August 9, 2008. The discharge summary stated: "Imp. not rule out psychogenic unclear etiology."

16

Dr. John Franco was the plaintiff's treating doctor for twenty-five years. He retired a few years ago. Prior to this accident, the plaintiff contends that he had no health problems and no pain and no medications. However, in January 2003, the plaintiff consulted Dr. Franco for Meniere's Disease which causes severe vertigo and dizziness. In addition, on November 30, 2004, the plaintiff complained of joint pain including calf pain, leg pain, knee and wrist pain, aggravated by activity. Also, he consulted Dr. Franco on April 12, 2005 for back pain radiating to his foot with tingling.

The plaintiff was also treated by a chiropractor, a Dr. Rugen, starting in the late 1990s, and as recently as 2005. Dr. Rugen's records reveal that on January 7, 2002, he was hospitalized for three days for vertigo. These records also indicate that in September 2002 to October 2002, the plaintiff was treated for upper back pain. On May 27, 2003, the plaintiff complained of right lumbar pain radiating to his heels.

In addition, five years before the accident at issue, the plaintiff was given epidural injections for complaints of back and lower spine pain. At that time, the back pain was worse when he was standing and walking. As a result of the back pain, he worked in the office rather than out in the field. On a scale of one to ten, the plaintiff described his prior back pain as a number three. During this time, the plaintiff underwent an MRI of the lumbar spine resulting in an impression of "right paracentral and foraminal L3/L4 herniation deforming the dural sac and compressing the existing right L3 roots," together with "a central and left paracentral L5/S1 herniation." In 2005, the plaintiff was diagnosed with two lumbar spine herniations. When asked to describe his pain, at that time, he responded with a seven out of ten.

On April 28, 2005, Dr. Thomas Dowling diagnosed his condition as "mechanical

low back pain with underlying degenerative disk disease with sciatic component, possible stenosis spinal." The back pain was radiating to the lower extremities more on the left, and was severe.

On June 2, 2005, the plaintiff was treated by Dr. Joseph Sanelli. The history presented to Dr. Sanelli on June 2, 2005, is as follows:

> "And the history of present condition, this is a 58-year-old male who presents with history of predominately left lower extremity pain, numbness and paresthesia along the posterior aspect to the foot with intermittent low back pain as well. The low back pain is only slight in degree with his main complaint being the left lower extremity symptoms which he rates at a 7 out of 10 in severity, increasing with prolonged standing, walking and general activities and improved with lying down and sitting."

Dr. Sanelli's record also indicates that the plaintiff's symptoms have been getting progressively worse since November 2004. His impression was a "left lower extremity lumbosacral radiculopathy in a predominatly L5/S1 distribution." The treatment prescribed by Dr. Sanelli in June 2005 was for the plaintiff to undergo a trial of lumbar epidural steroid injections.

The Court notes that in his deposition, the plaintiff testified that he had no prior issues with his neck, back, legs and feet.

On redirect examination, the plaintiff testified that after the injections in June 2005, he got better. In addition, his counsel reviewed Dr. Franco's records from November 2005 to May 2008, including fifteen visits and there were no complaints of neck or back pain. The plaintiff testified that after the epidural injections in 2005, his back pain cleared up. Dr. Franco made a report to the Workers' Compensation Board on September 10, 2008 in which he stated his impression as "Spinal cord contusion - concussion."

## 5. **Dr. Michael Rubin**

Dr. Michael Rubin is a board certified neurologist and a professor of neurology at Weil Cornell New York Presbyterian Hospital.  He first examined the plaintiff on August 20, 2008.  The plaintiff's condition had been diagnosed at a local hospital as a spinal cord concussion and he was sent for physical therapy.  When Dr. Rubin first examined the plaintiff he was in a wheelchair and unable to move at his hips, knees or ankles. The plaintiff's reflexes were brisk and he found no evidence of a mass lesion or a cord infarction.  His findings were consistent with spinal cord trauma.  Dr. Rubin wished the plaintiff well and hoped that he would get better.

His attorney sent the plaintiff back to Dr. Rubin on February 7, 2013.  The plaintiff had some movement in his legs; a grade two of five; and his reflexes remained brisk.  The plaintiff had a few beats of clonus; a sign of an upper motor neuron lesion or a cord lesion and he was unable to walk.  The plaintiff was in an electric wheelchair and Dr. Rubin's impression was that he had "improved somewhat but not much."  (Tr. at 85). The plaintiff was sent for another thoracic spine MRI, which showed no intrinsic cord lesion so that there was an "MRI negative spinal cord injury."  (Tr. at 85).

Dr. Rubin testified that the plaintiff had clonus which was an upper motor neuron lesion injury; meaning an abnormality.  Dr. Rubin explained that:  "An upper motor lesion means there is something abnormal with the upper motion neuron . . . it could be from many different things."  (Tr. at 88).  Also, it could be from an accident such as the plaintiff described to him.  This condition is consistent with a spinal cord concussion.

Dr. Rubin further explained that a SSEP test was performed at Stony Brook Hospital on October 24, 2008.  An SSEP test stands for "Somatosensory Evoked

Potentials," which procedure indicated a condition that was consistent with the plaintiff's claims. This procedure tests the transmission of an impulse up the spinal cord to the brain, and was consistent with spinal cord dysfunction namely a lesion in the spinal cord. According to Dr. Rubin, even though the MRI and the spinal tap done to the plaintiff were all negative, the plaintiff can still be suffering from a spinal cord trauma, meaning something abnormal in the spinal cord.

Based on his two examinations and a review of the tests given to the plaintiff and the findings of all the plaintiff's doctors, Dr. Rubin's diagnosis of the plaintiff's medical condition was a spinal cord concussion, with the posterior portion of the back side of the cord spared; which is why he had normal sensation. Asked to render his opinion as to the prognosis for the plaintiff's future, Dr. Rubin testified that, "I don't think he will change much." (Tr. at 97). Also, Dr. Rubin stated that in his opinion, this medical condition was caused by the plaintiff's "fall on the cord." (Tr. at 99). Also, directly questioned as to an issue in this case, Dr. Rubin testified that he did not think that the plaintiff was faking this injury.

Finally, Dr. Rubin was questioned about the surveillance video of February 2012, which showed the plaintiff getting out of his car and, with the aid of one cane able to walk a few feet to a ramp and walk up the ramp about eight feet to the back door of his home. Dr. Rubin testified that this would not be inconsistent with his findings. He stated that "people have good days and people have bad days" and in a good day the plaintiff may be able to walk 30 feet, "but it is not inconsistent with a spinal cord injury." (Tr. at 101).

On cross-examination, Dr. Rubin was directed to his report dated February 28,

2013, in which he stated that Mr. Berroyer's condition is consistent with mild spinal cord injury due to concussion.  Also, his record revealed that the plaintiff had no prior medical history.  In addition, he noted that the plaintiff also suffered from multi-level degenerative disc disease.

### 6.  Dr. Stewart Levine

Dr. Stewart Levine is a psychiatrist.  The plaintiff's attorney asked Dr. Levine to examine the plaintiff, which he did on November 6, 2012.  He also reviewed all the medical records and reports and the deposition testimony of the plaintiff and Mrs. Berroyer.

Getting directly to the issue he was called for, plaintiff's attorney asked the following questions:

> Q.    Now Doctor, you were informed, were you not when you first were called into the case that there was a claim in the case that Mr. Berroyer was faking, correct?
>
> A.    Yes.
>
> Q.    Now, what I'd like you to tell us and put aside everything you reviewed for the purpose of these questions.  Okay?
>
> A.    Yes.

(Tr. at 186).

Dr. Levine's psychiatric examination of the plaintiff revealed that the plaintiff was cooperative; he was calm without anxieties; and there was no evidence of any antisocial personality disorder.  In Dr. Levine's view there was nothing in the plaintiff's past to indicate that he was a faker.

On the contrary, the plaintiff had a long history of steady work.  His diagnosis

was that he found no psychiatric diagnosis.  In addition, Dr. Levine agreed with Dr. Hershberger, a psychiatrist who examined the plaintiff for the defense and who ruled out any conversion disorder.  He explained that a conversion disorder is "a neurologic finding that has a unconscious motivation."  (Tr. at 190).  In conclusion, Dr. Levine found no evidence that the plaintiff was faking.  He believes that the plaintiff's neurologic condition of difficulty or inability to walk is real and that he is not malingering.  As to the video surveillance, he cannot shed any light on the conclusion from those videos and he cannot read the plaintiff's mind.

On cross-examination, Dr. Levine testified that in his report to plaintiff's counsel, he rendered an opinion that the plaintiff is not suffering from a psychiatric illness and does not demonstrate any attempt to feign, amplify or distort his symptoms or limitations.  Also in his report, Dr. Levine stated that: "conversion does not seem to be a diagnosis in this case."  (Tr. at 198).

Questioned about the difference between "faking" and "exaggerating," Dr. Levine stated that faking encompasses exaggeration.  However, there might be a middle ground.

In his report, Dr. Levine wrote that the plaintiff had back problems five years prior to the 2008 accident.  He had sciatica and received treatment of shots in his back for the pain.

Again, on redirect examination, Dr. Levine stated that he based his opinion on a review of the records and the surveillance video, and he did not see anything that indicated that the plaintiff exaggerated.

### 7.  **Professor Alvin Mickens**

Professor Alvin Mickens is an economist.  He reviewed the plaintiff's income tax returns from 2004 to 2010.  The plaintiff's occupation was as an executive and co-owner of Best-Temp Mechanical Corp.  Professor Mickens testified that the plaintiff averaged about $104,400 per year in his two most recent years prior to his injury.  He calculated the plaintiff's loss of earnings from the year 2008 to the year 2012 was the sum of $415,992, not including the fringe benefits.  The fringe benefits were the sum of $208,246.00, so that the total amount of lost income was the sum of $624,238 to the year 2012.  Extending to the future losses, Professor Mickens calculated the lost income at $544,884 and the lost fringe benefits at $272,764 for a total future loss of earnings at $817,648.  Professor Mickens then calculated the total past and future loss of earnings to be the sum of $1,441,886.  He computed the plaintiff's future lost earnings to age 69.  Strangely, with regard to the future loss of earnings and the reduction to present value Professor Mickens testified that this resulted in an increase of the total figures to $1,473,430.  The Court finds this computation by Professor Mickens very confusing, and, in the Court's view, not reliable.

On cross-examination, Professor Mickens was questioned about the plaintiff's W2 for the year 2008, which revealed that his earnings for the seven months prior to July 23, 2008, the date of the accident was the sum of $22,049.  However, he did not include this fact, the $22,049 earned in 2008 – in his calculation of the plaintiff's loss of earnings.  So that the fact that the plaintiff worked seven months in 2008 and earned $22,049 was not included in his calculations and in his analysis.  Professor Mickens avoided this calculation because 2008 "was an unusual year in terms of economic

downturn, the overall economy collapsed." (Tr. at 222). In his calculation he ignored the plaintiff's actual earnings in 2008, even though he testified that economic conditions didn't improve in 2009 or 2010. He based his wage opinion on income from 2009 to 2012 on the total 2006 to 2008 income, not on the 2008 income alone.

The parties stipulated that the fringe benefits in the Mickens report should be reduced from fifty percent to forty percent because of a double calculation. Also, Professor Micken testified that his figures and percentages were derived from the Bureau of Labor Statistics and not from the actual data extracted from the company records.

On his redirect examination it was brought out that at the time of his accident the plaintiff was still working full time at the age of sixty-one; and, of course, he was an executive who owned his own company.

### 8. Dr. Lawrence W. Shields

Dr. Lawrence W. Shields is a clinical neurologist. He examined the plaintiff on April 4, 2012. He was sent all the previous medical reports and records. He knows that a defense in this case is that the plaintiff is exaggerating his injury. The MRI's were all negative for any spinal cord abnormality. The clonus and the brisk reflexes are the two most important factors to confirm the presence of an upper motor neuron lesion. Clonus means a rapid, upward and downward movement of the foot; the foot "flutters" as one pushes on the patient's foot. According to Dr. Shields, all the hospitals and the plaintiff's doctors tested for clonus and found it. Also the doctors found hyperreflexion; meaning when the doctor taps the knee tendon the leg shoots out, and that reflects an upper motor neuron problem.

24

Dr. Shields disagrees with the opinion of the defendant's expert, Dr. Arthur Rosen that the plaintiff is exaggerating his medical condition, and explained his reasons in detail. After his review of the records and his neurological examination of the plaintiff, Dr. Shields was asked whether he came to a diagnosis of the plaintiff's condition. His diagnosis is: "Post traumatic myelopathy, which means the spinal cord was injured." (Tr. at 286).

At St. Catherine's Hospital, within a week of his accident, conversion disorder remained the diagnosis of exclusion. So that at St. Catherine's Hospital within a week of this accident, conversion disorder was entertained as a possible diagnosis, to be excluded. However, Dr. Shields testified that both psychiatrists called by the plaintiff and the defendant have ruled out conversion disorder. In this regard, the Court questioned Dr. Shields, as follows:

THE COURT:          What is a conversion disorder?

THE WITNESS:        Conversion disorder would be - - the old term for it was
                    hysteria. It meant there was nothing wrong with you
                    organically, that is there was no reason that you couldn't
                    move, say, a body part, but because of some psychologic
                    problem you weren't moving it.

THE COURT:          Because of what problem?

THE WITNESS:        Psychologic. It was in your mind. That's what it meant. Of
                    course, the comment that preceded this, the neurologic
                    exam was not consistent with this being an organic problem,
                    which means something really wrong is incorrect, it's
                    inaccurate for the reasons that I have said, the hyperreflexia,
                    the clonus and the weakness.

(Tr. at 288).

The hospital records reveal that the plaintiff did not have bladder or bowel

incontinence.  These functions are neurologically controlled, but, according to Dr. Shields, does not exclude upper motor neuron lesions.

Dr. Shields viewed the video surveillance and stated that this did not indicate that the plaintiff was exaggerating his condition.  Dr. Shields rendered an opinion that the fall in this case was the cause of his medical conditions.

On cross-examination it was brought out that Dr. Shields acknowledged in his report that in the discharge record from St. Charles Hospital it is noted that "Mr. Berroyer was independently eating, grooming, dressing and performing transfers and was able to walk 150 feet without a wheel chair."  (Tr. at 295).  In his report however, he noted that "Mr. Berroyer remains severely paraparetic and cannot ambulate without Lofstrand crutches."  In his report, Dr. Shields stated that "without his crutches, Mr. Berroyer could not walk at all."  He was reminded that Dr. Rubin's opinion was that the plaintiff's condition was consistent with a minor spinal cord injury due to concussion, sparing the posterior columns.

### 9.  Ruth Berroyer

Ruth Berroyer has been married to the plaintiff for forty-six years.  She is still employed in the family business as a bookkeeper.  The plaintiff's business is still doing well with her brother-in-law operating the firm.  The business operates eleven trucks and has fourteen employees.  When her husband left the business it hurt its operation because of the many things that he did.

Prior to this accident, she and her husband were happily married.  They had an active social life and were involved in boating and life with their children.  The plaintiff is a strong man with amazing upper body strength.  After her husband was injured, he

was frustrated and upset and it took awhile to accept "our life." Their life had changed. They do not go into the City except for physician visits. However, they still are involved with boats, although he worries about his condition.

This injury to her husband has affected their sex life and they are frustrated and tired, and only engage in sexual activities one time a month.

On cross-examination, it was brought out that prior to the accident the plaintiff had recurring back pain down to his legs. He was treated for Minere's Disease and took valium as recently as in 2007.

## B. The Government's Case

### 1. Michelle Lanberg

Michelle Lanberg is employed by the IRS as a Safety and Health Specialist. She had work related training including a review of OSHA Regulations. She used these Regulations in her job as a Safety Officer at the IRS. The IRS conducted safety inspections of its office space on a semiannual basis, namely twice a year. She was not personally involved in the inspection of 118 (1180) Veterans Memorial Highway on or before July of 2008. On July 23, 2008 and prior to that date she was not aware of any safety complaints filed with regard to the conference room in question.

On cross-examination, Lanberg testified that, after this accident there was an investigation by IRS employees. There were e-mails and a "sticky note" by IRS employees about fixing the problem of the loose cord on the floor under the table in Room 323. There were disagreements between IRS employees as to whether or not holes should have been made in the table after the accident. There was a temporary

solution of taping the cord.  Eventually, IRS employees directed that a contractor come

in and drill a hole in the conference table for the cord to come through.  In a key portion,

Lanberg testified that a loose telephone cord under the table would be a "trip hazard".

Q.      I ask you to assume Mr. Enterlin testified there were 15 feet of loose cord
         under the table from the junction box to the phone.

         MR. KNAPP:            Objection.

         THE COURT:            Overruled.

Q.      If on a semiannual inspection, you had come across a scenario like that, if
         that had happened, would you have reported it?

         MR. KNAPP:            Objection.

         THE COURT:            Overruled.

A.      Yes.

Q.      Why?

A.      It would be a trip hazard.

Q.      When you reported it, am I correct, based upon the procedures in the
         building, if it were deemed that you were correct, that it was a trip hazard,
         it would have been addressed by IRS people.

         Let me change it a little.

         If you are having trouble with it let me change it a little.

         Am I correct, and eventually if you reported it, somebody employed by
         the IRS would have had a contractor come in and fix it.  Would that be
         a fair statement?

A.      Yes.

(Tr. at 72, 73).

## 2. __Richard Enterlin__

Richard Enterlin has been an employee of the IRS for thirty-nine years. He is a Supervisor of the Revenue Officer Group. On July 23, 2008, the date of this occurrence, he was a Revenue Officer. His duties were to secure unfiled tax returns, collect unpaid taxes and enforce the administrative tax laws. In preparation for his testimony he reviewed the accident report and the case file and financial records of Best-Temp Mechanical Corp. As part of his duties, he meets with taxpayers to obtain financial information and arrange repayment of taxes or secure tax returns. He conducts these meeting with taxpayers at the IRS Hauppauge office in the conference rooms. In meeting with taxpayers he always sat in the seat nearest the door, near a remote control panic button for a safety precaution measure.

On July 23, 2008, Enterlin met with the plaintiff in the conference room. The meeting concerned the plaintiff's business account Best-Temp Mechanical, Corp. with regard to unpaid payroll taxes and the plaintiff's personal liability for such taxes. Enterlin had previously made a visit to Best-Temp and left a summons in the office. He was looking for books and records of the company. Even though the plaintiff did not bring in the records he requested, the tone of the meeting between them was pleasant and businesslike. "There was no animosity or anything like that." (Tr. at 384).

At the meeting, the plaintiff requested an installment agreement and Enterlin asked for the plaintiff's personal and business records. The Government had previously levied on the Best-Temp bank account. The plaintiff's request for an installment agreement was not agreed to by the Government. Enterlin gave the plaintiff a summary and blank financial form to fill out for the business and for him personally.

29

He was given a month to fill out the forms.  The meeting lasted almost an hour.  During the meeting the plaintiff never got up from his seat at the table.

Enterlin described the conference room.  The telephone was sitting in the middle of the table; the telephone cord was under the table; the cord was roughly fifteen feet long.  There had been attempts to secure the telephone.  Others tried to tape the telephone to the table several times prior to the accident.  Asked by the Court whether the telephone was taped to the table at the time of the occurrence, Enterlin responded: "Not that I'm aware of, no."  (Tr. at 393).

Enterlin then related how the plaintiff rose from the table and fell.  The plaintiff stood up and was putting his file together when he lost his balance and fell to the right and hit the filing cabinet.  Enterlin did not see the telephone cord around his foot.  At the same time that the plaintiff was falling he saw the telephone was "jerked over to the side across the table and I think the handle part became dislodged from the phone as well."  (Tr. 395-396).

After the plaintiff's fall, Enterlin asked the plaintiff if he was okay.  According to Enterlin, they both then left the conference room "within a minute."  (Tr. at 400).  They had both walked across the office to the door leading to the hall.  He opened the door for the plaintiff.  Both of them walked to the bank of elevators and the plaintiff entered the elevator and Enterlin returned to his own office.

Within an hour, the plaintiff called him from the parking lot and told him that he was not feeling well and was going to seek medical attention.  After the telephone call, Enterlin went into his supervisor's office and told him what happened and they decided to fill out an accident report.  In the accident report (Pltfs' Ex. 41), Enterlin stated that

30

the taxpayer tripped when his foot caught in a telephone wire under the table. The taxpayer lost his balance and fell into a metal file cabinet. Enterlin stated that he saw the plaintiff trip. Thereafter, the plaintiff called him from the parking lot to say that he lost feeling in his lower leg and his shoulder hurts.

Enterlin also testified that he knew of no other similar trip incident prior to July 23, 2008. He does not recall seeing the telephone cord actually taped to the table. He did not recall seeing the telephone cord taped on the day of this occurrence.

### 3. Paul Scrivanich

Paul Scrivanich is a Special Agent with the Department of Treasury. He was trained in the latest tracking techniques and in video surveillance. He was asked to conduct a video surveillance of the plaintiff. Initially, he did a site survey and then made two video surveillances of the plaintiff.

On February 29, 2012, he was in a van and did a video surveillance of the plaintiff's home and driveway. At 7:59 am, the plaintiff, in a wheelchair, brought in a garbage can. At 10:36 am, the plaintiff came outside without a wheelchair; using a cane. He entered a van in the driveway and drove away with his wife as a passenger. At 11:11 am, the plaintiff's van returned and the plaintiff got out using one cane, but walking with difficulty. At 12:57 pm, the plaintiff left the house in a wheelchair to get the mail. At 2:13 pm, the plaintiff left the house with one cane, got into the van and pulled away at 2:15 pm.

On cross-examination, the Special Agent conceded that he never saw the plaintiff walk without a cane or two canes or a wheelchair. Also, he never saw the plaintiff walk a distance greater than to the sidewalk near the garbage can or to the

SUV in the driveway.

### 4. **Dr. Arthur Rosen**

Dr. Arthur Rosen is a neurologist. He reviewed all of the plaintiff's hospital and medical records, the reports of the plaintiff's experts and the surveillance videos. The Court found Dr. Arthur Rosen to be a very credible witness. He interpreted some of the language in the St. Catherine's Hospital records, such as "flaccid paraplegia," which means no movement at all and no resistance to passive movement, in the lower extremities. Also, the plaintiff had "mild hyperflexia in his lower extremities but a negative babrinski toe sign," meaning his reflexes were somewhat brisker than one sees in an average individual. Also the negative babrinski sign means that the pathways in the nervous system that are responsible for a babrinski toe sign were not damaged. In addition, his cremasteric reflex was absent as well as his lower abdominal reflex, meaning impairment of the muscle fibers and the nerve supply to those muscles. The sensation in his lower extremities, his legs, was normal. That means that whatever condition he had did not involve the sensory pathways. According to Dr. Rosen, there was not a complete transection of the spinal cord. Dr. Rosen stated that: "If there is a spinal cord lesion, it is not so severe that it took out not only the motor pathway but the sensory pathway. It preserved the sensory pathways." (Tr. at 481).

Also, the plaintiff had no bowel or bladder problems. According to Dr. Rosen, this was significant because "individuals who have severe spinal cord damage . . . will almost always have incontinence, urinary incontinence and to a lesser extent fecal incontinence. If he did not complain of these issues, that is an indication that the injury presumably at this point to his spinal cord was not so severe as to damage those

32

fibers." (Tr. at 481, 482).

There was disc herniation at the thoracic spine but no pressure on the spinal cord so that "could not have been the cause of his problem . . . The damages seen on the MRI of his lumbar spine and his cervical spine were consistent with just some degenerative disc disease which is not uncommon in anyone his age." (Tr. at 482). Continuing his review of the St. Charles Hospital records, it was noted that the plaintiff went from a paraplexia to a parapareses, meaning from complete paralysis to a weakness over a one week period. Then, the record revealed that "sensation remained normal and he did not report any bladder or bowel incontinence." Dr. Rubin interpreted the hospital record to state that the plaintiff's sensation was normal from the beginning; there was no sensory loss and no involvement in the nerves that control sensation in the spine. Also, as stated above, he did not have any bladder or bowel incontinence, meaning that the fibers that enervate the bowel and the bladder, were not involved.

Of importance to the issues in this case, the hospital record further stated, "at one point during that hospitalization, the possibility of a psychogenic etiology for the patient's symptoms was considered." (Tr. at 484). Dr. Rubin was questioned about this terminology:

> Q. The paragraph continues. At one point, during that hospitalization, the possibility of a psychogenic etiology for the patient's symptoms was considered.
>
> What does that mean, and is there any significance to it?
>
> A. That means that his treating physicians were uncomfortable with the fact that he had this weakness in his legs, and nothing was seen on the MRI. And that despite the weakness in his legs, he did not have any sensory changes and did not have any incontinence.

And I can't read their minds, but looking at their notes I suspect that they thought this was a little unusual.

Q.   The paragraph continues.  Five days after the fall the patient reported having an erection.  What is the significance of that finding?

A.   The fibers, the nerve fibers that control erectile function actually run along with or part of the same bundle of fibers that controls urinary function and bowel function.

So again, people with a major injury to the spinal cord will have urinary incontinence, fecal incontinence, and impotence.  And he did not have any of that.

(Tr. at 484, 485).

Further the St. Charles Hospital record revealed that upon discharge the plaintiff could walk 150 feet without a wheelchair.

In October 2008, the plaintiff was evaluated by a Doctor Pourmand at the Stony Brook University Hospital.  Dr. Pourmand noted that the MRIs and the LP (the lumbar punctured spinal tap) were normal and the patient did not lose bladder bowel function. The Stony Brook Hospital record continued, stating, "the patient reported some improvement over the prior two or three months.  At that time he was ambulating with a walker".  According to Dr. Rosen that meant that he was clearly improving.  Dr. Pourmand felt that the patient had a contusion of the spinal cord.  Dr. Rosen then defined the term, contusion of the spinal cord.

Q.   . . . What does that mean?

A.   A contusion of the spinal cord means that if the spinal cord is bruised or rattled around in the spinal canal there is a trenchant dysfunction of the spinal cord.  Portions of the system within the spinal cord shut down.  And when you talk about a contusion in general you are talking about a trenchant system shut down, as opposed to a more severe involvement with the spinal cord.

34

Q.    Trenchant system shut down, what does that mean?

A.    It means that initially the patient had major symptoms of paraplegia, and he is now improving.  And that is what you expect with a contusion.  And there was no evidence of anatomical derangement on the MIR of the spine.

Q.    In terms of Doctor Pourmand, referring to this as a contusion of the spinal cord.

      Do you agree with Doctor Pourmand's finding at that point?

A.    Yes.

Q.    In your experience as a teacher of neurology and a practicing neurologist, what does it mean for a patient to have a contusion of the spinal cord?

A.    It means that they have some sort of trauma to the spinal cord.  It can be a direct blow to the spinal cord, it could be indirect trauma to the spinal cord.  And there is a disruption of the nerve pathways without any significance anatomical changes within the spinal cord.  That is, you don't have tearing or shearing forces applied to structures within the spinal cord.  You don't have cell or nerve death in the spinal cord.  You merely have thing are bruised.  (sic)  And like a bruise, if you get a bruise on your arm or your leg it hurts for awhile and then it heals.  That is what is meant by a contusion.

Q.    What is the prognosis for patients who sustain a contusion of the spinal cord?

A.    In a contusion where there is no MRI evidence of anatomical changes within the spinal cord, the prognosis is excellent.

Q.    Your paragraph continues, A repeat MRI of the thoracic cord and lumbar cord were obtained and they did not reveal any evidence of spinal cord injury.

      What does that mean, and what if any significance is there?

A.    Well, I think Doctor Pourmand was looking for some delayed changes that might show up on an MRI.  Sometimes an MRI done early does not necessarily show any changes.  But if you repeat the MRI a month, two, three months later and you may see some abnormalities. He did not find any, and I think that was consistent with his impression that it was a

contusion and not structural damage to the spinal cord.

(Tr. at 489 - 491).

So that, in Dr. Rosen's opinion, the injury to the plaintiff's spine was a contusion to the spinal cord but there was no structural damage to the spinal cord.

Dr. Rosen examined William Berroyer on January 27, 2012.  The plaintiff had no problem with his memory or with his erectile or bowel function.  He complained of some minimal movement of his legs; some dull aches and numbness in both legs from the groin down to his toes.  In the course of an hour's exam, Dr. Rosen found "significant variability in the strength of these muscles, which is something that one does not see with spinal cord disease . . . but not in the course of an hour.  It just doesn't."  (Tr. at 515).  Further, Dr. Rosen reported that the plaintiff had "brisk reflexes" and he did not find clonus.  He defined clonus as an extreme hyperreflexia where you stretch a tendon and the muscle contracts, relaxes in a rhythmic manner, that indirectly damages the motor pathway from the brain to the spinal cord.  He found no clonus.

Dr. Rosen performed what is called a modified Hoover Test and he found that it was not consistent with organic disease or with physiological disease.

> ". . . And so I concluded from that, that the Hoover Test was
> not consistent with organic disease, with physiological
> disease."

Q.     When you say organic disease; what do you mean?

A.     I'm sorry if I'm - - I use these terms interchangeably.  Organic means this
       is something physically wrong with the patient.  And these findings were
       not consistent with something physically wrong.  The results of the Hoover
       Test indicated that this was a nonphysiological response.

Q.     You say Hoover.  You mean modified Hoover?

36

A.      Modified Hoover.  This was a nonphysiolocial response.

(Tr. at 522, 523).

As to clonus, Dr. Rosen explained that often there will be clonus in patients who have shown significant recovery from the effects of a prior damage.  Here, according to Dr. Rosen, there was no clonus.

Dr. Rosen was shown the videos of the plaintiff on February 29, 2012.  He noticed that in one view, the plaintiff was using a single cane in his right hand and he had his left hand in his pocket.  In his view, this was unusual because patients who have these gate disturbances requiring the use of a cane do not encumber their other hand.  They keep the other hand free so that if they lose their balance, they can stay upright by the movement of their other free hand.

Also, Dr. Rosen stated that the plaintiff got into his car "the same way I do: right leg and butt in first and then the left leg pulled in by itself."  (Tr. at 533).  He also noticed that the plaintiff walked up the ramp with a 5-degree incline, which was "pretty good for someone who is supposed to have major weakness in the muscle of his legs.  That's excellent."  (Tr. at 534).  Also, he noticed that the plaintiff removed his key, unlocked the door and entered, the way it's done by people without disabilities.

Dr. Rosen also reviewed the April 20, 2012 video and saw, that at one point, the plaintiff looked in the direction of the van and may have seen the van in which the investigator was using the video camera.  Thereafter when the plaintiff entered his house, he picked up his left foot to clear the threshold.  In his view, having seen the plaintiff enter the house on the prior occasion, "the foot drop was fictitious."  (Tr. at 542).

Dr. Rosen testified, that in his opinion, the plaintiff sustained a spinal cord

contusion, which is a traumatic myelopathy, meaning that the spinal cord does not function for some point of time. Further, asked directly whether or not Berroyer sustained an injury, Dr. Rosen testified as follows:

> Q.    What is that opinion as to whether or not he sustained an injury?
>
> A.    He did sustain an injury.
>
> Q.    What was that injury?
>
> A.    He sustained a traumatice myelopathy.
>
> Q.    To what degree?
>
> A.    Mild.  And resolved.

(Tr. at 550).

Further, Dr. Rosen testified that "his weakness is for the most part if not entirely, nonphysiological."

> Q.    When you call it nonphysiological, what are you referring to?
>
> A.    Nonphysiological means that there is no physical basis for the defect that the patient claims.

(Tr. at 551).

He was reminded that Dr. Rubin, the plaintiff's neurologist, in his February 23, 2013 report states that:  "his condition is consistent with mild spinal cord injury due to concussion."

Finally, Dr. Rosen was asked about the serious symptoms that the plaintiff is now complaining of, and their relation to the injuries in this case.

> Q.    Do you have an opinion within a reasonable degree of medical certainty as to the symptoms Mr. Berroyer complained of during your exam and the symptoms he complains of today?

As to the basis of those or lack of basis of those symptoms.

A.    I found such contradictory findings on my examination, such variability in my examination, that I was skeptical that this was a permanent, fixed deficit.

And the fact that it was now a couple of years after the injury in someone who had no abnormalities indicating - - no abnormalities on the MRI indicating anatomical damage to the spinal cord, are consistent with that belief.

Q.    Is it possible to have an injury to the spine that is not detectable on the MRI?

A.    Yes, it is.  But the symptoms of lesion - - the symptoms of such small magnitude would not show up with - - a patient with such small magnitude symptoms would not have the kind of symptoms that Mr. Berroyer complains of.

Q.    Is there a better test than MRI that can be done to try to identify a problem with the spine?

A.    The neurological examination - -

Q.    In terms of identifying a lesion?

A.    I think the neurological examination coupled with the MRI is about as good as it gets.

(Tr. at 551, 552).

Dr. Rosen conceded that when he conducted his examination of the plaintiff he made no notes; he relied on his memory even though he conducts at least 100 neurological examinations a month.

On cross-examination, Dr. Rosen also conceded that a number of doctors who treated or examined the plaintiff did find that he suffered from clonus.  Dr. Rosen then conceded that the plaintiff did have clonus in the past and may very well have it now.

Q.    Thank you.  You know what judge?  All right.  Make your comment.  Go ahead.

39

A. I believe that this man has had clonus in the past.  He may very well have it now.  At the time of my examination, he did not have it.

I am not contesting the fact that he had clonus.  I am not contesting the fact that clonus is a manifestation of damage, past or present, to the motor pathway in the nervous system."

(Tr. at 564).

Dr. Rosen was asked directly, whether the plaintiff is either faking or malingering.

After he testified:

Q. Now, with respect to an injury, if he has one - - and when I say that I understand that you say he once did but he doesn't any more - - he is either faking or malingering.  Which one would you chose?

A. I don't use the terms faking or malingering.  I use the term nonphysiological.

(Tr. at 567).

Dr. Rosen still believes that there is a possibility that conversion disorder is present in this case.   However, Dr. Rosen firmly testified that "there is no doubt in my mind that he had traumatic myelopathy from the injury.  There is no doubt about that."

Q. Okay.

Can we agree with this: If it's not conversion disorder, you still think it could be, but if it's not, then if we were ruling that out while you call it nonphysiological, in layman's language it's either faking or malingering.  True?

A. I don't like those terms.

Q. I don't like them either, but let's get down and dirty.  He is either a phony or he is exaggerating.  Isn't that true?

A. I think there is a gray area there that you're overlooking, if I may.

There is a gray area that you're overlooking.  And if I may explain. There is no doubt in my mind that he had traumatic myelopathy from the injury.  There is no question about that.  The only question is, at what

40

point did it start to resolve, and how much of what he has now are residual from any myelopathy, and how much of what he has now represents nonphysiological symptoms.

I feel fairly confident that much of his original symptoms have resolved, and he is left with not physiological symptoms.  I still think they could be a form of conversion reaction or they might be malingering.

Q.     Okay, so if it's not conversion reaction, it's malingering.  True?

A.     That is what I said.

Q.     Okay.  Now, let's go back to, if it's a real injury, or even when it was a real injury, which you said at one point in time it was?

A.     Yeah.

(Tr. at 569-570).

Dr. Rosen conceded that one cannot fake having a clonus and that, certainly at one time, the plaintiff did sustain a clonus.  Dr. Rosen also conceded that not one treating doctor or the hospital or the Workers Compensation doctor, made a diagnosis of the plaintiff faking, exaggerating or malingering.  Also, he never reviewed the physical therapy records.  Again, Dr. Rosen confirmed that the history in this case is consistent with the diagnosis of a spinal cord contusion.

## II. DECISIONS

### A. As to Liability

The Federal Tort Claims Act ("FTCA"), provides for lawsuits against the United States for injuries "caused by the negligent or wrongful act or omission of any employer of the Government while acting within the scope of his office or employment under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

28 U.S.C. § 1346(b).  The Act defines "employee of the Government" to include officers

and employees of any federal agency."  The FTCA is a limited waiver of sovereign

immunity making the Federal Government liable to the same extent as a private person

for certain torts of employees of the government acting within the scope of their

employment.

Under the FTCA, the liability of the United States is the same as that of a private

person in the State of New York.  See 28 U.S.C. § 1346(b).  The Government is liable

for tort damages "under circumstances where the United States, if a private person,

would be liable to the claimant in accordance with the law of the place when the act or

omission occurred."  Guttridge v. United States, 927 F.2d 730 (2d Cir. 1991); Chen v.

United States, 854 F.2d 622, 625, 626 (2d Cir. 1989).  "The liability of the federal

government under the FTCA is generally determined by state law."  Mortise v. United

States, 102 F.3d 693 (2d Cir. 1996).  See also Taylor v. United States, 121 F.3d 86, 89

(2d Cir. 1997).  In this case, the liability of the federal government is to be determined

by New York law.

It is interesting to note that neither attorney in their post-trial memoranda covered

the issue of negligence and liability.  Their memoranda were solely concerned with the

issues of injuries and damages.  However, in order for this decision to encompass all of

the issues involved in this case, the issues of liability and negligence will be determined

by the Court.

It is undisputed that Richard Enterlin was an employee of the federal

government.  It is also undisputed that the IRS, an agency of the federal government

had the duty and obligation to maintain the conference room in the IRS building in 1180

Veterans Memorial Highway in Hauppauge in a room designated by the IRS as Room 323, in a reasonably safe condition.  Also, there is no doubt that the IRS had the duty to ensure that there are no hidden traps on the floor under the conference room table.  Further, the Court finds that an unseen loose telephone cord under the table constituted a potential danger to an unaware person sitting at the table.  Thus, the Court finds that the failure to remove the potential trap or, at the least, to tape the telephone cord to the floor, constitutes negligence on the part of the IRS and the United States.  See, for example, Liebowitz v. New York Telephone, 217 A.D.2d 647, 630 N.Y.S.2d 252 (2d Dept. 1995) (whether the defendant New York Telephone Co. negligently installed and maintained the telephone wires over which the plaintiff allegedly tripped and fell, was a triable issue).

Therefore, the defendant, the United States of America is liable for the injuries sustained by the plaintiff William Berroyer, Sr., and the loss of services of the plaintiff Ruth Berroyer.  Also, the Court finds that there was no contributory negligence on the part of the plaintiff William Berroyer, Sr.

**B.  As to Damages**

    **1.  Personal Injuries – Pain and Suffering**

        (a) To the Present Date

If the plaintiff had a treating physician, it was Dr. Michael Rubin, a board certified neurologist who examined the plaintiff on August 20, 2008 and then again February 7, 2013.  When Dr. Rubin first examined the plaintiff on August 20, 2008, he was in a wheelchair and apparently unable to move at his hip, knees or ankles.  However, on

examination, Dr. Rubin found that his reflexes were brisk, his sensation was intact, and he found no evidence of a mass lesion or a cord infarction.  There was nothing abnormal in his spine.  His findings were consistent with the diagnosis of a spinal cord concussion.  After this examination, Dr. Rubin wished him well and hoped that he would get better.

Dr. Rubin did not see the plaintiff again until February 7, 2013, four and one-half years after the initial visit.  At that time, Dr. Rubin found that the plaintiff had some movement in his legs, a grade of two of five; was unable to lift his legs; was in an electric wheelchair; and unable to walk.  The plaintiff was sent for another thoracic spine MRI, which showed no intrinsic cord lesions and the MRI was negative for a spinal cord injury.  Dr. Rubin found that the plaintiff had clonus which was an upper motor neuron lesion or abnormality, which could be as a result of many different things, including an accident such as the plaintiff described to him.  The condition is also consistent with a spinal cord concussion.

Based on his two examinations and a review of all the prior medical records and reports, Dr. Rubin made a diagnosis of a spinal cord concussion, with the posterior position of the back side of the cord spared, which is why he has normal sensation. Further, Dr. Rubin offered the following opinion:  (1) as to the prognosis for the plaintiff's future, "he didn't think he will change much"; (2) the condition was caused by the plaintiff's "fall on the cord"; and (3) he did not think that the plaintiff was faking this injury.

However, of importance, Dr. Rubin made a report, dated February 28, 2013, after the second examination, in which he stated that "Mr. Berroyer's condition is

consistent with a mild spinal cord injury due to concussion." The Court previously described Dr. Michael Rubin as a credible witness and the Court finds that the injury sustained by the plaintiff William Berroyer, Sr., was a mild spinal cord injury due to concussion of the spinal cord. In addition, in his report, Dr. Rubin noted that the plaintiff also suffered from multi-level degenerative disc disorder. This prior condition is unrelated to the occurrence of July 23, 2008.

The other medical witnesses called by the plaintiff did not add much to the testimony of Dr. Michael Rubin. Dr. Steward Levine is a psychiatrist, who testified that, in his opinion, there was no evidence that the plaintiff was faking his injury or that was a malingerer or that the plaintiff was exaggerating his injury. Dr. Lawrence W. Shields is a clinical neurologist who examined the plaintiff on April 4, 2012. His diagnosis was post-traumatic myelopathy, which means that the spinal cord was injured. In his opinion, without his crutches, the plaintiff could not walk at all. The Court has some difficulty with Dr. Shields testimony and find that in places it lacks credibility.

There is evidence in the record that the plaintiff's injury is non-physiological, namely, as defined by Dr. Rubin, "non-physiological means that there is no basis for the deficit that the patient claims." (Tr. at 551).

The St. Catherine's Hospital record reflected that his "MRI findings are relatively minor." On July 26, 2008, he was diagnosed with "acute paraplegia, psychogenic in origin." On that same day, July 26, 2008, the record revealed, "psychogenic paraplegia cannot be ruled out," and "patient able to maintain stand one minute."

On July 31, 2008, the plaintiff's last day at St. Catherine's Hospital, he had a psychological consultation; and the record revealed:

> "Neuro exam and MRI findings not compatible with
> subjective complaints, raising question of conversion
> disorder.  Affect is somewhat inappropriately bright."

(Tr. at 202).

At St. Charles Hospital on August 7, 2008, physical therapist Gary Harrison

reported in a progress note that Mr. Berroyer "continued to present with inconsistent

bilateral lower extremity muscle strength and control during varied activities."  (DXB, p.

50).  Also, physical therapist Harrison noted on that same date, that Mr. Berroyer stated

that he isn't concerned if he needs to be in a wheelchair 1-2 years."  (DXB, p. 53).  The

St. Charles Hospital record reflected that his "MRI findings are relatively minor."  On

July 26, 2008, in the hospital he was diagnosed with "acute paraplegia, psychogenic in

origin" and the same day "psychogenic paraplegia cannot be ruled out."  On July 31,

2008, his last day at St. Catherine's Hospital after a psychological consultation, the

record revealed, "Neuro exam and MRI findings not compatible with subjective

complaints, raising questions of conversion disorder."  (Tr. at 282).  Also, St. Charles

Hospital there was a progress note as of August 7, 2008 stating, "inconsistent muscle

strength, psychogenic?"  The St. Charles Hospital discharge summary, on August 9,

2008 stated:

> MRI as well, which, again, did not find any significant results.
> Lumbar puncture negative.  Neurosurgery follow-up note
> from St. Catherine impression was the patient cannot be
> ruled out for a psychogenic paraplegia based on MRI finding
> and preservation of reflexes, bladder function, and
> sensation.  Conclusion from other hospital – patient
> diagnosed with myelopathy of unclear etiology.

Upon review of the records, the Court finds that prior to the accident of July 23, 2008, the plaintiff William Berroyer, Sr., suffered from unrelated prior multi-level degenerative disc disease in the spine. The Court further finds that as a result of the telephone wire incident of July 23, 2008, the plaintiff sustained a mild spinal cord injury due to a concussion of the spinal cord. This injury was a competent providing cause of pain and disability in walking for some period of time. The Court further finds, that the plaintiff failed to prove, by a preponderance of the evidence, that he cannot walk and must use a wheelchair to ambulate. The video in evidence indicates that he can walk with a cane and, perhaps, without such an aid.

In sum, the Court finds that the plaintiff William Berroyer, Sr., sustained a mild spinal cord injury which has caused pain and some disability to the present date.

In addition, as to the use of a wheelchair, the Court finds that the plaintiff failed to prove, by a preponderance of the evidence, that his injury has caused alleged paraparesis and inability to walk and consequently full time use of a wheelchair. The plaintiff identified at least six treating physicians, and yet, the plaintiff only called one, Dr. Michael Rubin, whose treatment consisted of only two visits, four and one-half years apart. The Court notes that the plaintiffs failed to call Dr. John Franco, Berroyer's treating physician for twenty-five years. In a lawsuit of this kind, where the plaintiff contends that he is permanently confined to a wheelchair and cannot work, only one treating doctor was called and he saw the plaintiff only two times and diagnosed a mild contusion of the spinal cord with no structural damage to the spinal cord.

As to damages, a review of the precedents is always helpful. Although not a similar injury, such as a concussion of the spinal cord, in <u>Kihl v. Pfeffer</u>, 47 A.D.2d 154,

848 N.Y.S.2d 200, (2d Dept. 2007), the thirty-seven year old plaintiff injured her ankle and her spinal cord. She incurred spinal fusion surgery, which removed the disc between C2 and C3 and replaced it with a bone chip. Id. at 157. Her unbearable pain led to the insertion of a morphine pump which delivered numbing medication directly to the spinal cord. In the Court's view, a far more serious injury. The Appellate Division Second Department affirmed $625,000 for past pain and suffering and $1.2 million for future pain and suffering, together with medical expenses and loss of earnings. In McKithen v. City of New York, 292 A.D.2d 253, 738 N.Y.S.2d 856 (2d Dept. 2002), the plaintiff was stabbed in the back and also suffered from post traumatic stress disorder. An award of $400,000 for past pain and suffering was affirmed.

The Court appreciates that "[a]ssigning dollar amounts to pain and suffering is an inherently subjective determination," Marcoux v. Farm Services & Supplies, Inc., 290 F. Supp. 2d 478 (E.D.N.Y. 2003) (quoting Pahuta v. Massey-Ferguson Inc., 997 F. Supp. 379, 385 (W.D.N.Y. 1998)). The Court also recognizes that the facts of each case are different and there may be case-specific variables that reasonably lead to a higher or lower amount in damages.

Given the particular facts presented in this case, the Court finds that the plaintiff William Berroyer, Sr., is entitled to a recovery in the sum of $350,000 for his past pain and suffering from July 13, 2008 to the date of this decision.

(a) As to Future Pain and Suffering

As stated above, the Court finds that the plaintiff failed to prove, beyond a preponderance of the evidence, that he cannot walk without the use of a wheelchair. The Court also finds that the plaintiff has established that he will have some pain and

48

difficulty in walking, in the future. After a review of the record, including the plaintiff's prior back conditions and the final diagnosis of a mild spinal cord injury, the Court finds that, the plaintiff is awarded the sum of $250,000 for the future pain and suffering for a period of 15 years from the date of this decision.

## 2. **Past Medical Expenses**

The plaintiff's counsel stated in his closing argument that the parties stipulated that the plaintiff's past medical expenses to the date of the trial, was the sum of $112,000. Accordingly, that sum is also awarded to the plaintiff William Berroyer, Sr. There has been no credible proof of any future medical expenses and none is awarded.

## 3. **Loss of Earning – Past and Future**

The Court declines to make any award for loss of earnings, on the grounds, first that the plaintiff failed to prove that he sustained an injury that would prevent him from working. Second, the testimony of the plaintiff's expert as to loss of earnings was confusing, contradictory and not credible. Third, there was no medical evidence that the plaintiff was unable to work, past or future, because of his injuries.

It is well settled that loss of earnings claims "must be ascertainable with a reasonable degree of certainty and may not be based on conjecture. Glaser v. County of Orange, 54 A.D.3d 997, 998, 864 N.Y.S.2d 557 (2d Dept. 2008); Davis v. City of New York, 264 A.D.2d 379, 379-80, 693 N.Y.S.2d 230 (2d Dept. 1999). Also, "a claim for lack of earnings must be established with reasonable certainty." Morgan v. Rosselli, 23 A.D.3d 356, 357, 804 N.Y.S.2d 763 (2d Dept. 2005); see also Gomez v. City of New York, 260 A.D.2d 598, 599, 688 N.Y.S.2d 661 (2d Dept. 1999); Potorniak v. Ripcic, 232

A.D.2d, 541, 542, 648 N.Y.S.2d 668 (2d Dept. 1996); <u>Bacigalipo v. Healthshield, Inc.</u>, 231 A.D.2d 538, 539, 647 N.Y.S.2d 32 (2d Dept. 1996).

Initially, with regard to the loss of earnings claim, the Court notes that there was no medical expert opinion that the plaintiff could not work until the date of this trial, or that he could not work in the future. None of the doctors called by the plaintiff testified that, as a result of this injury, he was unable to work – either in the past or in the future. The plaintiff's employment with Best-Temp Mechanical Corp. at the time of this occurrence did not involve physical work. The plaintiff testified that he was involved in estimating jobs and getting new business. There is no evidence in this record that the plaintiff could not do any work in his own business.

A claim for past and future loss of earnings of this kind, especially in a family-owned business, requires medical testimony connecting the plaintiff's injuries to the inability to work. <u>See</u> <u>Razzoque v. Kiskow Taxi, Inc.</u>, 238 A.D.2d 161, 162, 656 N.Y.S.2d 208 (1st Dept. 1997); <u>Szymole v. Barretti Carting Corp.</u>, 304 A.D.2d 558, 756 N.Y.S.2d 904 (2d Dept. 2003). No medical expert testified that he could not continue to work for Best-Temp, even in a wheelchair. Nor did any medical expert testify that he could not work for Best-Temp in the future. In addition, the Court is concerned with the plaintiff's credibility problem, referring to his deposition denial of any prior back condition. This was a family operation and some cooperation as to his working ability and hours, would be expected.

### 4. As to Loss of Services

The concept of loss of service is designed to compensate for the injury to the marital relationship and to "the interest of his injured party and spouse in the

continuance of a healthy and happy marital life." <u>Millington v. Southeastern Elevator Co.</u>, 22 N.Y. 2d 498, 504-505 293, N.Y.S. 2d 305, 309-310 (1968). An award for loss of services or consortium, as it is sometimes called, may include components for both the past and the future. <u>See</u>, <u>e.g.</u>, <u>Patterson v. Kummer Development Corp.</u>, 302 A.D.2d 873, 875, 755 N.Y.S.2d 180 (4th Dept. 2003) (mem.); <u>Geltzer v. Leventhal</u>, 287 A.D.2d 435, 436-37, 730 N.Y.S.2d 873, 873-74 (2d Dept. 2001) (mem).

The Court awards to Ruth Berroyer, for the loss of services of her husband from the date of this occurrence, July 13, 2008 to the present date, the sum of $100,000. As to future loss of services, the Court awards to her an additional sum of $50,000.

## IV.  <u>CONCLUSIONS</u>

For the reasons stated above, it is hereby

ORDERED, that judgment be granted to the plaintiff William Berroyer, Sr., against the defendant United States of America, in the total amount of $712,000, consisting of $350,000 for past injuries and pain and suffering; $250,000 for future pain and suffering; and $112,000 for past medical expenses; and is further

ORDERED, that judgment be granted to the plaintiff Ruth Berroyer against the defendant United States of America, in the total amount of $150,000, consisting of past loss of services the sum of $100,000 and future loss of services in the sum of $50,000.

**SO ORDERED.**

Dated:  Central Islip, New York
          January 2, 2014

                                    _/s/ ARTHUR D. SPATT____
                                       ARTHUR D. SPATT
                                   United States District Judge